# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| BOBBIE O'GRADY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV 825 ERW(LMB) |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Bobbie O'Grady for Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 19).

## Procedural History

On December 27, 2010, plaintiff filed her applications for benefits, claiming that she

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

became unable to work due to her disabling condition on November 21, 2007. (Tr. 148-54, 155-62). These claims were denied initially, and following an administrative hearing, plaintiff's claims were denied in a written opinion by an Administrative Law Judge (ALJ) on February 7, 2012. (Tr. 75-79, 6-20). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on March 27, 2012. (Tr. 5, 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on November 17, 2011. (Tr. 23). Plaintiff was present and was represented by counsel. (Id.). Medical experts James Reed and Lee Fischer were present by telephone. (Id.).

The ALJ examined plaintiff, who testified that she was fifty-three years of age. (Tr. 25). Plaintiff stated that she had been living in an apartment for approximately two months. (Id.). Plaintiff testified that prior to living in the apartment, she lived on the streets for five years. (Id.). Plaintiff stated that she lived in a tent in a tent city by the river in St. Louis. (Tr. 26).

Plaintiff testified that she obtained her GED and attended community college for two years to become an EMT. (Id.). Plaintiff stated that she also received training to become a nurse's aide. (Id.).

Plaintiff testified that she was injured at work prior to her alleged onset of disability date. (Id.). Plaintiff stated that her employer did not have workers' compensation insurance because they had less than five employees. (Tr. 27). Plaintiff testified that her employer paid her medical

bills but then deducted the amount from her paychecks. (Id.). Plaintiff stated that she was unable to afford treatment. (Id.). Plaintiff testified that she initially received treatment at Barnes Hospital. (Id.). Plaintiff stated that the doctors at Barnes prescribed medication and knee braces. (Id.).

Plaintiff testified that she has problems with her knee, back, and right hip. (Tr. 28). Plaintiff stated that she has been told that she needs knee replacement surgery, but that she should wait until she is in her sixties to undergo surgery to avoid undergoing repeat surgeries. (Id.). Plaintiff testified that she underwent cortisone injections in her knee beginning in 2007 at the VA, but she recently stopped receiving the injections because they only provided temporary relief. (Tr. 29). Plaintiff stated that she started receiving treatment at the VA in December of 2007, when she discovered she was eligible for VA services. (Id.).

Plaintiff testified that she takes muscle relaxants, pain relievers, high blood pressure medication, and uses pain ointments. (Tr. 30). Plaintiff stated that recently took medication for bronchitis. (Id.). Plaintiff testified that she smokes "[w]hatever couple cigarettes I can pick up off the street to smoke." (Id.).

Plaintiff testified that she spends a significant amount of time online. (Id.). Plaintiff stated that she has Internet access at St. Patrick's Center. (Id.). Plaintiff testified that she walked from the tent city to St. Patrick's Center, which is a distance of five to six blocks. (Tr. 31).

Plaintiff stated that she does not leave her apartment every day. (Id.). Plaintiff testified that she leaves her apartment to go to doctor appointments and to go to the grocery store. (Id.). Plaintiff testified that she walks to her doctor appointments at the VA, which is a distance of about twenty-four blocks, because she has no bus fare. (Tr. 32).

Plaintiff testified that, when she is at her apartment, she plays Sodoku and crotchets. (<u>Id.</u>). Plaintiff stated that she does not have a computer or a telephone. (<u>Id.</u>). Plaintiff testified that she does not participate in activities at St. Patrick's because these programs are for recovering drug addicts. (Tr. 33). Plaintiff stated that the individuals participating in these activities are still using drugs, and she does not want to associate with them. (<u>Id.</u>).

Plaintiff stated that she had a problem with alcohol in the past but she had not consumed alcohol in approximately four months. (<u>Id.</u>). Plaintiff testified that she stopped drinking due to the medications she takes and her lack of finances. (<u>Id.</u>). Plaintiff stated that she does not attend group support meetings because she has no transportation. (<u>Id.</u>).

Plaintiff testified that she experiences pain in her back, hip, and knee after carrying a bag of groceries five blocks. (Tr. 34). Plaintiff stated that she is able to be on her feet for an hour to an hour-and-a-half before she has to sit. (<u>Id.</u>). Plaintiff testified that she is only able to sit for fifteen minutes at a time due to her hip pain. (<u>Id.</u>).

Plaintiff stated that she takes pain medication, uses a topical ointment, and uses hot and cold compresses for her pain. (<u>Id.</u>).

Plaintiff testified that she has difficulty tying her shoes. (<u>Id.</u>).

Plaintiff stated that she often uses a walking stick. (Tr. 35). Plaintiff testified that she wears a knee brace and a back brace. (<u>Id.</u>). Plaintiff stated that the back brace was prescribed by VA physicians the day prior to the hearing for her lower back pain. (<u>Id.</u>).

Plaintiff testified that she does a limited amount of household chores, including washing dishes. (Tr. 36). Plaintiff stated that she cooks simple meals, such as Ramen noodles. (<u>Id.</u>). Plaintiff testified that she does laundry in her apartment building, but she is only able to carry half

of a bag of clothes at a time due to her pain.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she was standing during the hearing due to hip pain.  (Id.).  Plaintiff stated that her back brace irritates her hip when she sits or bends.  (Id.).  Plaintiff testified that she experiences knee pain when she stands for an hour to an hour-and-a-half.  (Tr. 36-37).  Plaintiff stated that she is able to stand for about fifteen minutes without experiencing pain.  (Tr. 37).

Plaintiff testified that she recently lost over fifty pounds in an effort to decrease her knee pain, but she has not noticed any improvement.  (Id.).

Plaintiff stated that she was in the military from 1979 to 1986.  (Id.).  Plaintiff testified that she attended vocational classes and college classes in the late 1970s, prior to joining the Army.  (Tr. 38).

Plaintiff stated that her last job was working as a mechanic for John's Auto Repair.  (Id.).  Plaintiff testified that her father trained her as a mechanic beginning when she was thirteen.  (Id.).

Plaintiff stated that St. Patrick's Center occasionally gives her bus passes to go to doctor appointments.  (Id.).  Plaintiff testified that she did not have a bus pass the day of the hearing and had to walk to the hearing.  (Id.).

Plaintiff stated that she sees Dr. Zarmeena Ali for treatment of her rheumatoid arthritis.[2] (Tr. 39).  Plaintiff testified that she has been seeing Dr. Ali since the beginning of 2011.  (Id.).

Plaintiff stated that she also experiences depression due to her health and financial issues.

---

[2]A generalized disease, occurring more often in women, which primarily affects connective tissue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet.  Stedman's Medical Dictionary, 160 (28th Ed. 2006).

(Id.).

The ALJ re-examined plaintiff, who testified that she lies down during the day because she does not sleep well at night due to her back, hip, and knee pain. (Tr. 40). Plaintiff stated that she takes Trazodone,[3] but it does not help much with her sleep. (Id.). Plaintiff testified that she is only able to sleep about two hours at a time at night while taking Trazodone. (Id.).

Plaintiff stated that, when she walks to the VA, the round trip takes about six hours. (Id.).

Plaintiff testified that she recently started taking Gabapentin.[4] (Id.). Plaintiff stated that she takes Tramadol[5] every three to four hours. (Id.).

Plaintiff testified that her doctors have recommended physical therapy, but she did not attend physical therapy because she had no transportation. (Tr. 41).

The ALJ next examined medical expert Dr. Lee Fischer, who testified that he was a board certified family physician. (Id.). Dr. Fischer stated that he had listened to plaintiff's testimony and had reviewed plaintiff's medical records. (Tr. 45). Dr. Fischer testified that, since November of 2007, plaintiff has had diagnoses of degenerative joint disease[6] of the right knee, right hip

---

[3]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited May 3, 2013).

[4]Gabapentin is indicated for the treatment of seizures and nerve pain conditions. See WebMD, http://www.webmd.com/drugs (last visited May 3, 2013).

[5]Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See Physician's Desk Reference ("PDR"), 2429 (63rd Ed. 2009).

[6]Degenerative joint disease, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

bursitis,[7] right hip pain, hypertension, cervical degenerative disc disease,[8] lumbosacral degenerative disc disease, and osteoarthritis. (Id.). Dr. Fischer stated that plaintiff also has a history of alcoholism and substance abuse. (Id.).

Dr. Fischer testified that, in his opinion, plaintiff does not meet or equal a medical listing. (Tr. 46).

Dr. Fischer testified that plaintiff is capable of light physical exertional level work; can climb stairs occasionally; should never climb ropes, ladders or scaffolds; can bend or stoop occasionally; should never kneel, crouch, or crawl; has no manipulative, communicative or visual limitation; should avoid all unprotected heights and unprotected hazardous machinery; and should avoid wet or uneven surfaces in the workplace. (Id.).

Dr. Fischer testified that the record contains evidence of sacroiliac ("SI") joint tenderness and paraspinal tenderness as noted by Dr. Ali. (Tr. 46-47). Dr. Fischer stated that he did not believe plaintiff was restricted to standing and walking less than two hours as found by Dr. Ali. (Tr. 47). Dr. Fischer testified that he did not believe the objective evidence supported these restrictions. (Id.). Dr. Fischer stated that plaintiff has no disc herniation, some arthritis in the right knee but no arthritis in the left knee, and her bilateral hip x-rays were normal. (Id.).

Dr. Fischer explained that right hip bursitis is a condition where the bursa, fluid filled sacks that cushion joints, become inflamed. (Id.). Dr. Fischer testified that bursitis is a condition that would not be expected to last twelve months or longer or produce a chronic disability. (Tr. 48).

---

[7]Inflammation of a bursa. Stedman's at 282.

[8]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

Dr. Fischer stated that bursitis is usually an acute condition that is treated with an injection into the bursa.  (Id.).

Plaintiff's attorney next examined Dr. Fischer, who testified that plaintiff's February 2008 x-ray of the right hip revealed "probably normal aging arthritis in the hip joint," but a subsequent MRI was normal.  (Id.).  Dr. Fischer stated that arthritis can be painful at any age.  (Id.).

Dr. Fischer testified that crepitus is a physical exam sign where when an individual moves a joint, one can hear a crunching sound.  (Id.).  Dr. Fischer stated that crepitus can be normal in most people and does not correlate with pain.  (Id.).  Dr. Fischer testified that degenerative joint disease in the neck could cause plaintiff pain.  (Tr. 49).

Dr. Fischer testified that plaintiff has objective evidence of some arthritis in the right knee, and some degenerative changes in her lumbar spine.  (Id.).  Dr. Fischer stated that some individuals with those findings could have pain but others would not have pain.  (Id.).

Dr. Fischer testified that he did not believe there was objective evidence to support Dr. Ali's finding that plaintiff would miss more than four days a month of work.  (Tr. 51).

Dr. Fischer testified that he believes the medical evidence supports the finding that plaintiff could lift ten pounds frequently, and between ten and twenty pounds occasionally.  (Id.).

The ALJ re-examined Dr. Fischer, who testified that plaintiff took Tramadol for pain, but was not taking any specific rheumatological medication.  (Id.).  Dr. Fischer stated that there was no evidence she has inflammatory arthritis that would require such drugs.  (Id.).

The ALJ next examined medical expert James Reed, who testified that he was a clinical psychologist and that he had examined plaintiff's medical records.  (Tr 53).  Dr. Reed stated that plaintiff has a long history of poly-substance dependence-alcohol, cocaine, cannabis, and tobacco.

(Tr. 55).  Dr. Reed testified that plaintiff has not had any consistent mental health treatment.

(Id.).  Dr. Reed stated that plaintiff has been described at various times as having a mood disorder

or a psychotic disorder, but she has not consistently taken medication and it is unclear whether

she has a mental disorder that is not substance induced.  (Id.).

Dr. Reed testified that there is no evidence that plaintiff meets or equals any psychological

or psychiatric listing.  (Id.).  Dr. Reed stated that there is inadequate description of psychotic or

mood symptoms to support a diagnosis of psychotic disorder and mood disorder independent of

being substance induced.  (Tr. 57).

Plaintiff's attorney next examined Dr. Reed, who testified that, although plaintiff was

given a GAF score of 40[9] by a VA provider, he was unable to make a diagnosis because there was

evidence of alcohol, cannabis, and cocaine dependence.  (Tr. 58).

The ALJ examined plaintiff, who testified that she received training in the Army and from

her father.  (Tr. 60).  Plaintiff stated that she worked for John's Auto Repair for five years, until

2007.  (Tr. 61).

Plaintiff testified that she worked as a prep chef for one year prior to 2007.  (Id.).  Plaintiff

stated that she prior to this, she worked in plant maintenance in prison when she was an inmate.

(Id.).  Plaintiff testified that she was in prison for three years for a felony DUI conviction.  (Tr.

62).

Plaintiff stated that she worked as a mechanic at a truck stop prior to her imprisonment.

---

[9]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or communication
(e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas,
such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids
friends, neglects family, and is unable to work...)."  Diagnostic and Statistical Manual of Mental
Disorders (DSM-IV), 32 (4th Ed. 1994).

(Id.).

The ALJ next examined the vocational expert, Margaret Ford, who testified that plaintiff's past work is classified as follows: fast food cook (medium), waitress (light in the DOT, heavy as performed by plaintiff), automobile mechanic (medium in the DOT, very heavy as performed by plaintiff), and kitchen helper (medium in the DOT, heavy as performed by plaintiff). (Tr. 64). Ms. Ford testified that none of plaintiff' skills are transferable to light or sedentary jobs. (Tr. 66).

The ALJ asked Ms. Ford to assume a hypothetical claimant with plaintiff's background and the following limitations: able to lift twenty pounds occasionally and ten pounds frequently; stand or walk about six hours in an eight-hour work day; sit at least six hours in an eight-hour workday; should avoid repetitively operating foot controls with the right lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; occasionally stoop; should avoid kneeling, crawling, and crouching; should avoid concentrated exposure to extreme cold, whole body vibration, unprotected dangerous heights, and unprotected dangerous machinery; and is limited to simple and/or repetitive work that does not require close interaction with the public. (Tr. 67). Ms. Ford testified that the individual would be unable to perform plaintiff's past work. (Tr. 68). Ms. Ford stated that the individual would be able to perform other light, unskilled jobs, such as order filler (24,400 jobs in Missouri); inspector (7,900 jobs in Missouri); and hand packager (8,400 jobs in Missouri). (Id.).

Ms. Ford testified that a limitation of consistently missing more than two days a month would preclude competitive employment. (Tr. 69). Ms. Ford stated that a limitation of requiring an additional unscheduled break once a week would also preclude competitive employment. (Id.).

The ALJ indicated that he would leave the record open for thirty days to allow plaintiff to submit additional evidence.  (Tr. 70).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff received care at the Veteran's Administration John Cochran Medical Center ("VA") from December 2007 through the date of the hearing.  On February 4, 2008, plaintiff reported a ten-year history of right knee and hip pain.  (Tr. 303).  Plaintiff indicated that her knee pain was worse with going up and down stairs, and her hip pain was worse with ambulation and with lying on her right side.  (Id.).  Plaintiff underwent x-rays of the right hip, which revealed early minimal degenerative changes.  (Tr. 245, 306).  X-rays of the right knee revealed tricompartment osteoarthritis and small joint effusion.  (Tr. 247).  Plaintiff underwent steroid injections to treat her hip and knee pain.  (Tr. 306).

On March 1, 2010, plaintiff complained of right knee pain, which began when she was carrying groceries.  (Tr. 351).  Upon examination, plaintiff walked with a mild limp; decreased flexion and extension due to pain was noted; moderate swelling was noted; and mild warmth was noted.  (Id.).  Plaintiff was diagnosed with knee strain, and was prescribed Naproxen[10] and Tramadol.  (Tr. 352).  Plaintiff was advised to make an appointment with her primary care physician, as she had not been seen in a while.  (Id.).

On March 4, 2010, plaintiff was fitted for a hinged right knee brace.  (Tr. 350).

On March 18, 2010, plaintiff was interviewed by a screening committee for possible admission to the Domiciliary Residential Rehabilitation Treatment Program (DRRTP).  (Tr. 346-

---

[10]Naproxen is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis.  See PDR at 2633

47).  Plaintiff was extremely irritable throughout the interview and was easily angered when talking about legal issues and past stays at shelters.  (Id.).  Plaintiff was tearful at times.  (Tr. 347).  It was noted that plaintiff had a diagnosis of mood disorder NOS and psychotic disorder NOS but she had stopped taking her medication months prior because it increased her sex drive.  (Id.).  Plaintiff was trying to maintain sobriety on her own without supports, and she had consumed alcohol in the past month.  (Id.).  Plaintiff complained of hip and knee pain, which restricts her ability to walk and lift.  (Id.).  The committee recommended that plaintiff see a psychiatrist for an evaluation of mood disorder treatment and asked her to follow-up with her primary care provider about her hip and knee pain.  (Id.).  The committee also expressed concern about the appropriateness of plaintiff living in a group setting in the tent city without treatment of her mental illness.  (Id.).  Plaintiff became very angry and left, declining assistance.  (Id.).

On November 9, 2010, plaintiff presented with complaints of right hip pain and right knee pain.  (Tr. 339).  Upon examination, plaintiff's hip was tender to palpation, mild tenderness was noted to the lumbar area, and plaintiff's depression screening was positive.  (Tr. 340).  Plaintiff underwent x-rays of the lumbosacral spine, which revealed mild hypertrophic osteoarthritis.[11]  (Tr. 242).  X-rays of the right knee revealed degenerative and hypertrophic osteoarthritis changes with narrowing of the medial compartment.  (Tr. 243).  X-rays of the right hip were negative.  (Tr. 244).

Plaintiff presented to Dr. Zarmeena Ali at the VA for a rheumatology consult on December 16, 2010.  (Tr. 327-32).  Plaintiff complained of lateral right hip and right knee pain,

_____

[11]A variant of osteoarthritis characterized by periarticular osteophyte formation. Stedman's at 160.

- 12 -

which was relieved intermittently with over-the-counter Tylenol and aspirin. (Tr. 327). Plaintiff

reported that she was homeless and was living in a tent by the river. (Id.). Upon examination,

plaintiff's general appearance was described as alert, oriented, cooperative, and her affect was

anxious, calm, and disheveled. (Tr. 329). Dr. Ali noted crepitus on range of motion of the neck,

and harsh conducted sounds bilaterally in the chest. (Id.). Plaintiff's gait was normal. (Tr. 330).

Dr. Ali noted right trochanteric bursa[12] tenderness, right crepitus of the knee with medial joint and

lateral joint tenderness, no limitation in full extension, normal hip range of motion, and a trigger

point in the lower paraspinal muscles on the right. (Id.). Dr. Ali indicated that x-rays of

plaintiff's lumbosacral spine revealed mild lower spine degenerative joint disease; x-rays of the

right hip were unremarkable; and x-rays of the right knee revealed medial compartment narrowing

with osteophytes medially, laterally, and posterior, and possible calcification in the patellar

tendon. (Tr. 331). Dr. Ali's assessment was degenerative joint disease of the right knee and right

trochanteric bursitis.[13] (Tr. 332). With regard to plaintiff's right knee, Dr. Ali stated that,

although plaintiff complains of severe pain, no abnormality was noted on gait exam and no laity

was noted of the joint. (Id.). Plaintiff indicated that she wished to try intra articular steroid

injections, and Dr. Ali advised plaintiff that she may need to take medication as well to help with

the pain. (Id.). Dr. Ali indicated that plaintiff was not a surgical candidate. (Id.). Dr. Ali

administered a steroid injection in plaintiff's hip, and prescribed Naproxen for pain. (Id.).

Plaintiff also underwent injections in the right paraspinal tender point, and the right knee. (Tr.

---

[12]The trochanteric bursa is situated adjacent to the femur, between the insertion of the gluteus medius and gluteus minimus muscles into the greater trochanter of the femur and the femoral shaft. See Stedman's at 282.

[13]Inflammation of the trochanteric bursa. See Stedman's at 282.

325).

Plaintiff underwent a CT scan of the cervical spine on January 10, 2011, which revealed degenerative changes, most pronounced at C6-C7, C7-T1. (Tr. 601). Plaintiff also underwent a CT scan of the brain, which revealed no acute intracranial process, mild volume loss, and sinus disease. (Tr. 598).

Plaintiff presented to Dianna Moses-Nunley, Ph.D, licensed psychologist, on February 10, 2011, for a psychological evaluation at the request of the state agency. (Tr. 565-68). Plaintiff reported that she was applying for disability based on her physical problems, although she described worsening depression. (Tr. 565). Plaintiff indicated that she had experienced depression for many years, although her depression had worsened due to her knee and hip pain, difficulty getting around in the snow and ice, difficulty getting treatment, and being homeless. (Tr. 565). Upon mental health status examination, Dr. Moses-Nunley noted that plaintiff was dressed shabbily but appropriately for the weather, appeared somewhat disheveled in keeping with her reduced circumstances, her manner was slightly irritable but polite and cooperative, she walked with an obvious limp and moderately slow speed, her ability to relate was good, there were no abnormalities in speech flow or organization, her thought processes and content appeared normal, she described an irritable and sad mood, and her affect was congruent with her mood. (Tr. 566). Plaintiff's memory was adequate, her insight was fair, her judgment was adequate, her concentration was fair, her calculation was adequate, and her basic abstract reasoning was adequate. (Tr. 567). Plaintiff reported no impairment in activities of daily living, social functioning, self care, or concentration, persistence, and pace. (Id.). Dr. Moses-Nunley

diagnosed plaintiff with adjustment disorder[14] with depressed mood, and assessed a GAF score of 75.[15]  (Id.).  Dr. Moses-Nunley stated that plaintiff described expectable reactions to her environmental and physical difficulties, and that her mental health condition would likely be improved if she had a place to live, medical resolution of her physical pain , and work that she was physically able to do.  (Tr. 567-68).  Dr. Moses-Nunley stated that her evaluation did not find any significant mental health limitations that would impair her ability to perform or sustain work related activities.  (Tr. 568).

On February 14, 2011, Kyle DeVore, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique.  (Tr. 569-80).  Dr. DeVore expressed the opinion that plaintiff's mental impairments were not severe.  (Tr. 569).

Plaintiff saw Dr. Ali on April 7, 2011, at which time plaintiff reported no relief of her hip pain after the steroid injection, although she reported her knee was improved after the injection.  (Tr. 636).  Upon examination, plaintiff's gait was antalgic[16] on the right, her musculoskeletal exam revealed normal range of motion bilaterally, plaintiff's lumbar spine exam revealed right sided paraspinal tenderness at L5-S1, and tenderness over the right ischial bursa and right

---

[14]A disorder the essential feature of which is a maladaptive reaction to an identifiable psychological stress, or stressors, that occurs within weeks of the onset of the stressors and persists for as long as six months.  Stedman's at 567.

[15]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  DSM-IV at 32.

[16]A limp adopted so as to avoid pain on weight-bearing structures.  Stedman's at 99.

trochanteric bursa. (Tr. 637). Dr. Ali's assessment was ischial bursitis[17] and hypertension. (Tr. 639). Dr. Ali administered a steroid injection into the bursa, and prescribed Flexeril[18] and topical lidocaine. (Id.).

Plaintiff presented to Patrice L. Pye, Ph.D., licensed psychologist, at the VA, on May 25, 2011, for an initial psychology evaluation. (Tr. 626-29). Plaintiff's diagnoses were listed as psychotic disorder NOS and mood disorder NOS. (Tr. 627). Plaintiff reported decreased interest, energy, concentration, and appetite. (Id.). Plaintiff indicated that she slept about two hours a night due to being homeless. (Id.). Upon mental status examination, plaintiff described her mood as "pissed off," her affect was tearful, plaintiff reported that she heard voices and saw shadows, and her judgment and insight were poor. (Tr. 628-29). Dr. Pye indicated that plaintiff appeared unkempt and evidenced poor hygiene; her speech was pressured, loud and circumstantial; she became agitated while discussing her frustration related to people trying to take her things and force her from her tent; her affect was tearful and labile while she discussed her psychosocial history; she became increasingly agitated while discussing available treatment options at the VA; and she expressed frustration related to her inability to have transportation. (Tr. 629). When asked whether she wanted a referral to a recovery center, she became increasingly agitated and left. (Id.).

Plaintiff presented to Dr. Ali on October 12, 2011, at which time she reported continuing knee pain, right worse than left; joint swelling; and right outer hip pain. (Tr. 672). Plaintiff

---

[17]Inflammation of the bursa overlying the ischial tuberosity of the pelvis. Stedman's at 283.

[18]Flexeril is indicated for the treatment of muscle spasms. See WebMD, http://www.webmd.com/drugs (last visited May 3, 2013).

indicated that she was taking eight pills of Tramadol for pain daily, and that she would like stronger pain medication. (Id.). Plaintiff rated her pain as a nine out of ten on a daily basis. (Id.). Plaintiff indicates that she walks to her clinic appointments and thus cannot attend physical therapy. (Id.). Plaintiff's affect was described as angry, irate, and combative. (Tr. 673). Upon examination, plaintiff was limping on the right side; plaintiff's lumbosacral spine and right pelvic rim were tender to palpation; plaintiff's right hip internal rotation, abduction and adduction was painful with groin pain; bilateral knee crepitus was noted; and medial joint space tenderness was noted on the right side. (Id.). Dr. Ali's assessment was degenerative joint disease-painful right knee, right outer hip, groin, and lower back. (Id.). Dr. Ali indicated that she recommended non-steroidal anti-inflammatory drugs for pain, but plaintiff reported she has had no relief with these drugs in the past; plaintiff declined injections. (Id.). Dr. Ali recommended repeat imaging and MRI and indicated that referral to an orthopedist for her right hip would be considered. (Id.).

On October 27, 2011, plaintiff underwent an MRI of the lumbosacral spine, which revealed disc bulges centrally at L3-L4 and L4-L5. (Tr. 666).

On October 31, 2011, Dr. Ali completed a Physical Residual Functional Capacity Questionnaire, in which she indicated that plaintiff had been diagnosed with osteoarthritis of the hip and knee, and had the following symptoms: pain in the right hip and knee, difficulty walking, difficulty sleeping, and intermittent numbness in the right outer leg. (Tr. 685). Dr. Ali identified the following clinical findings and objective signs: paraspinal tenderness; right pelvic rim tender; SI joint tenderness; right hip rotation painful; positive flexion, abduction, and external rotation on right; and crepitus of the right knee. (Id.). Dr. Ali indicated that plaintiff's impairments lasted or can be expected to last at least twelve months. (Id.). Dr. Ali found that plaintiff suffered from

depression and anxiety, and that emotional factors contribute to plaintiff's symptoms and functional limitations. (Id.). Dr. Ali indicated that plaintiff experiences pain or symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks frequently. (Tr. 686). Dr. Ali found that plaintiff was capable of performing low stress jobs. (Id.). Dr. Ali found that plaintiff could walk one quarter to one half of one city block without rest or severe pain; sit one hour before she would need to walk or stand; stand twenty to thirty minutes before she would need to walk or sit down; stand or walk a total of less than two hours in an eight-hour workday; sit about two hours in an eight-hour workday; must walk around every thirty to forty-five minutes for five to ten minute periods during an eight-hour workday; requires a job that permits shifting positions at will from sitting, standing, or walking; needs to take unscheduled breaks three to four times during an average workday for periods of five to ten minutes; is able to lift less than ten pounds rarely and can never lift more than ten pounds; can never stoop, crouch, or climb ladders; and can rarely twist or climb stairs; and is likely to be absent from work as a result of impairments or treatment more than four days a month. (Tr. 686-88). Dr. Ali indicated that these limitations have applied for more than ten years. (Tr. 689). Finally, Dr. Ali stated that plaintiff is very irritable, has pressured speech, and is easily agitated. (Id.).

In a letter dated November 28, 2011, Amy M. Joseph, M.D., Associate Professor of Medicine at Washington University School of Medicine and Chief of Rheumatology at the VA, states that Dr. Ali is a Board Certified Rheumatologist and is employed at the St. Louis VA as a rheumatologist. (Tr. 227).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since November 21, 2007, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: multiple-joint degenerative joint disease and diabetes (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can sit for six of eight hours per day; stand and walk for six of eight hours per day; can lift 20 pounds occasionally and ten pounds frequently; cannot climb ladders, ropes or scaffolds; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl; cannot operate foot pedals with the right lower extremity, must avoid extremes of cold and must avoid all contact with hazards such as moving machinery and unprotected heights. The claimant is limited to simple, repetitive work with no close interaction with the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on December 26, 1957 and was 49 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-16).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on December 13, 2010, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on December 11, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 17).

# Discussion

## A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

**B.**　　　**The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity" determination.  See id.

　　If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

　　The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.     Plaintiff's Claims

Plaintiff first argues that the ALJ erroneously weighed the medical opinion evidence in determining plaintiff's RFC. Plaintiff next argues that the ALJ erred in determining that she could perform other work. The undersigned will discuss plaintiff's claims in turn.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can sit for six of eight hours per day; stand and walk for six of eight hours per day; can lift 20 pounds occasionally and ten pounds frequently; cannot climb ladders, ropes or scaffolds; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl; cannot operate foot pedals with the right lower extremity, must avoid extremes of cold and must avoid all contact with hazards such as moving machinery and unprotected heights. The claimant is limited to simple, repetitive work with no close interaction with the public.

(Tr. 13).

Plaintiff argues that the ALJ erred in assigning "little weight" to the opinion of treating physician Dr. Ali, and assigning "significant weight" to the opinion of medical expert Dr. Fischer.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)). Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

Title 20 C.F.R. § 404.1527(d) lists six factors to be evaluated when weighing opinions of

treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6).

Dr. Ali completed a Physical Residual Functional Capacity Questionnaire on October 31, 2011, in which she expressed the opinion that plaintiff could walk one quarter to one half of one city block without rest or severe pain; sit one hour before she would need to walk or stand; stand twenty to thirty minutes before she would need to walk or sit down; stand or walk a total of less than two hours in an eight-hour workday; sit about two hours in an eight-hour workday; must walk around every thirty to forty-five minutes for five to ten minute periods during an eight-hour workday; requires a job that permits shifting positions at will from sitting, standing, or walking; needs to take unscheduled breaks three to four times during an average workday for periods of five to ten minutes; is able to lift less than ten pounds rarely and can never lift more than ten pounds; can never stoop, crouch, or climb ladders; can rarely twist or climb stairs; and is likely to be absent form work as a result of impairments or treatment more than four days a month. (Tr. 686-88).

The ALJ found that Dr. Ali's opinion was inconsistent with the findings in the objective medical record. (Tr. 15). The ALJ noted that none of plaintiff's VA providers, including Dr. Ali, found the limitations that are detailed by Dr. Ali in her questionnaire. (Id.). The ALJ stated that, "given the utter lack of support in the objective medical record" for Dr. Ali's opinion, it was given "little weight." (Id.).

Dr. Ali is a rheumatologist employed by the VA. (Tr. 227). Dr. Ali began treating plaintiff for her hip and knee pain in February of 2008, and saw her every three to six months. (Tr. 685). In her questionnaire, Dr. Ali indicated that plaintiff exhibited symptoms of pain in her right hip and knee, difficulty walking, difficulty sleeping, and intermittent numbness in her right outer leg. (Id.). Dr. Ali stated that plaintiff's pain is on average a nine out of ten, and that she has minimal relief with medication and injections. (Id.). Dr. Ali indicated that plaintiff is unable to sleep due to pain, and she is irritable. (Id.). Dr. Ali listed the following clinical findings or objective signs in support of her opinion: paraspinal tenderness; right pelvic rim tender; SI joint tenderness; right hip rotation painful; positive flexion, abduction and external rotation on the right; and crepitus of the right knee. (Id.).

As previously stated, the ALJ discredited Dr. Ali's opinion based on the fact that it was unsupported by the objective medical record. Dr. Ali, however, cited specific objective findings in support of her opinion. Dr. Ali's treatment notes contain the findings to which Dr. Ali refers. In December 2010, Dr. Ali noted right trochanteric bursa tenderness, right crepitus of the knee with medial joint and lateral joint tenderness, and a trigger point in the lower paraspinal muscles on the right. (Tr. 330). In April 2011, Dr. Ali noted that plaintiff's gait was antalgic on the right, plaintiff had right-sided paraspinal tenderness at L5-S1, and tenderness over the right ischial bursa and the right trochanteric bursa. (Tr. 637). In October 2011, Dr. Ali indicated that plaintiff was limping on the right side; her lumbosacral spine and right pelvic rim were tender to palpation; her right hip internal rotation, abduction, and adduction was painful with groin pain; bilateral knee crepitus was noted; and medial joint space tenderness was noted on the right side. (Tr. 673). Dr. Ali prescribed pain medication and administered steroid injections for plaintiff's hip, back, and

knee pain. (Tr. 325, 639). Thus, Ali's opinion is supported by the objective findings contained in her own treatment notes. In addition, imaging revealed osteoarthritis in plaintiff's right knee (Tr. 305, 243), and osteoarthritis of the lumbar spine. (Tr. 242).

Dr. Fischer testified at the administrative hearing that the medical evidence supported the conclusion that plaintiff was capable of performing light physical exertional work. (Tr. 46). The ALJ found that Dr. Fischer's opinion was consistent with the notes in the VA record and the "consultative examinations." (Id.). The ALJ indicated that he was, therefore, assigning "significant weight" to Dr. Fisher's opinion. (Id.).

Although the ALJ indicated that Dr. Fischer's opinion was consistent with the "consultative examinations," plaintiff did not undergo a physical consultative examination. While the Physical Residual Functional Capacity Assessment completed in this case is consistent with the opinion of Dr. Fischer, it was authored by a non-physician single decisionmaker, Bonnie Young. (Tr. 213-18). To the extent the ALJ based his decision on the opinion of the non-physician single decisionmaker, it was error. See Andreatta v. Astrue, 2012 WL 1854749, *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by single decisionmaker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decisionmakers). See also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding case in which ALJ evaluated the opinion of a lay person as a medical expert).

The undersigned finds that the ALJ erred in discrediting the opinion of Dr. Ali and assigning significant weight to the opinion of Dr. Fischer. Dr. Fischer, a family physician, did not examine plaintiff. Rather, his opinion was based solely on a review of plaintiff's medical records.

"[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (internal quotation marks and citation omitted).

Dr. Ali was plaintiff's treating physician, and was the only examining physician who expressed an opinion on plaintiff's ability to function in the workplace. As such, Dr. Ali's opinion was entitled to substantial weight unless it conflicted with other medical evidence. Dr. Ali is a specialist in rheumatology, plaintiff saw her regularly for a period of almost four years, and her opinion was supported by her own treatment notes and the remainder of the medical record. Consequently, the relevant regulations support according significant weight to Dr. Ali's opinion. See 20 C.F.R. § 404.1527(d)(1)-(6).

In sum, the ALJ erred in discrediting the opinion of plaintiff's treating physician and relying on the opinion of a non-examining medical expert. The RFC formulated by the ALJ is, therefore, not supported by substantial evidence. The ALJ's step five determination, which is based on this erroneous RFC, is also not supported by substantial evidence.

As a result, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to accord the proper weight to the opinion of plaintiff's treating physician, Dr. Ali; if necessary, obtain additional medical evidence addressing plaintiff's ability to function in the workplace with her impairments; and reassess plaintiff's residual functional capacity.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.

Dated this 8th day of August, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE